MEMORANDUM OF DECISION
On December 16, 1997, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Marissa B. and David J. to their daughter Elizabeth J. On July 2, 1998, DCF filed a petition to extend Elizabeth's commitment to DCF, which commitment was set to expire on October 8, 1998. On September 17, 1998, this Court extended the commitment until the entry of a final judgment on the termination petition. A consolidated trial of the termination and the extension petitions took place on September 17 and 18, 1998. For the reasons stated below, the Court grants the termination petition and finds the extension petition moot.
 FACTS
The Court finds the following facts and credits the following evidence.
 A. Elizabeth
Elizabeth J. was born on November 24, 1995, making her almost three years old at the time of trial. Elizabeth was born five weeks premature and was hospitalized at birth due to jaundice. CT Page 11509 The parents visited her at the hospital but smelled of marijuana or alcohol and argued over who should feed her. The mother spent only a very limited time holding the baby.
In early December, Elizabeth left the hospital and began to reside with her mother at her maternal grandmother's house. The grandmother was not happy about this situation because she wanted her daughter to give up the baby. Visits by DCF workers revealed the residence to be cold and messy, with the staircase going to the baby's second floor room particularly cluttered. The kitchen smelled of cigarette smoke. The baby had a diaper rash and the mother did not understand the baby's milk formulas.
On December 6, 1995, DCF filed a petition to have Elizabeth adjudicated neglected and uncared for. On January 19, 1996, the Court granted an Order of Temporary Custody placing Elizabeth in the temporary custody of DCF. As part of the order, the Court enjoined the father, David J., from visiting either Elizabeth or the mother until further order of the Court. DCF placed Elizabeth with her paternal aunt, Rene H. Elizabeth remained there until about March 27, 1996. At that time DCF changed her placement because Rene's phone was disconnected, because there was apparently some animal feces found near the baby, and because Rene's husband was having an affair with another woman.
DCF then placed Elizabeth in a second foster home where she has remained to the present time. On October 8, 1996, the Court adjudicated Elizabeth to be uncared for due to specialized needs and committed her to DCF custody for one year. Exactly one year later, the Court extended the commitment to October 8, 1998, and found that continuing efforts to reunify the family were no longer appropriate.
As of late 1996, Elizabeth had some developmental delays. A year later, however, Elizabeth was an active and responsive child in good health. Elizabeth has now bonded with her foster family. She calls her foster parents "mommy" and "daddy" and plays with the other children at the foster home. Her foster parents give her love and attention. They have expressed an interest in adopting her. Instead of desiring to go to visits at DCF offices with her natural parents, Elizabeth wanted to go "home." Elizabeth has not asked about her natural parents and has no memories of them. The last time she saw her father was in March, 1997; her last visit with her mother was in September or October, 1997. CT Page 11510
 B. The Mother
The mother, Marissa B., was seventeen years old when she gave birth to Elizabeth and twenty years old at the time of trial. Marissa had a troubled youth. She would frequently lie to her mother. She displayed many other behavioral problems, was expelled from high school, and dropped out of an alternative high school. She attempted suicide on at least one occasion. Marissa used LSD before her pregnancy and marijuana and alcohol during her pregnancy.
Between February 16, 1996, and November 6, 1997, DCF scheduled 54 visits with Elizabeth. Of these the mother missed seventeen, mostly toward the end of the period, and in many cases without even notifying DCF that she would not be there. The mother did not contact DCF regarding Elizabeth's first birthday in November, 1996, and did not inquire about her first Christmas the next month. On June 11, 1997, and July 24, 1997, the mother requested that her visit with her daughter end early because the mother was restless and bored. Although the mother has asked for pictures of her daughter, and DCF has complied, the mother did not contact DCF concerning her daughter's second birthday and Christmas in 1997.
DCF initially recommended in 1996 that Marissa and the father attend parenting classes at the Hope for Life Center and they complied. Counseling was not successful, however, because the parents focused on their individual needs rather than those of their child. DCF referred the parents to Casey Family Services and again the parents attended some initial meetings. Ultimately, however, Marissa and David refused further services from Casey. Casey reported that despite every attempt to work with them, the couple had persistent problems including a "conflictual relationship, immaturity, lack of stable employment and housing as well as intense anger at DCF, the court and their lawyers." Marissa also refused drug and alcohol treatment at Catholic Family Services prior to September, 1996. In September, 1996, Marissa was arrested and moved out of her mother's home.
In September, 1997, DCF referred Marissa to the Lifeline program at the Wheeler Clinic for assistance with substance abuse, parenting, and domestic violence. One month later, the program discharged her due to poor attendance, in part stemming from transportation difficulties, and immature behavior. In late CT Page 11511 1997 Marissa informed DCF that she was pregnant through a different father. Marissa's last reported contact with DCF was in April, 1998. At that time Marissa was again staying with her mother. Marissa now has a new boyfriend and is attending AA and NA meetings.
 D. The Father
At the time of trial, the father, David J., was twenty-seven years old. As a young child he and his sister, Rene, were removed from their parents' house due to abuse. David graduated high school in the early 1990's. He is skilled in the four slide and other machines. Since the age of eighteen he has supported himself through steady employment and hard work. Because of his skills and industriousness, he has never had any difficulty obtaining employment. He has worked long hours and more than one job at a time.
The father regularly visited and called to inquire about Elizabeth while she stayed at Rene's. After Elizabeth's transfer to the second foster home in March, 1996, and through October, 1996, the father attempted to maintain regular visits with Elizabeth. Although there were times when the father missed or was late for visits, the reason was usually the fact that the father was working long hours. The father in fact made commendable efforts to overcome conflicting work schedules or the lack of transportation, often by finding a substitute to fill in for him at work, by riding a bicycle during the winter, and by walking long distances to and from work. In June, 1996, the father spent a short time in prison, apparently for failure to pay a fine. In October, 1996, DCF discontinued visits because of inconsistent participation by both parents. The father did not contact DCF regarding Elizabeth's first birthday or Christmas.
As stated, the father's 1996 record for completion of counseling and parenting programs was poor. The father refused to participate in drug evaluation or treatment, even though he had a drug history. In November, 1996, the father did comply with a DCF request for a psychological evaluation.[2] The evaluation revealed that the father had no significant emotional problems but that, because of a drug history and a tendency to have problems with authority, the father should receive parenting classes and substance abuse education. Both the father and the mother attended some parenting classes in early 1997, but there is no record of the father obtaining any substance abuse CT Page 11512 counseling.
Visits with Elizabeth resumed in February, 1997, in part because a new DCF worker gave the parents another opportunity. The father made three out of four scheduled visits in February and early March, but then ceased visiting. In May, 1997, the mother reported to DCF that the father was physically abusive to her and that he would come home drunk or on drugs. On one occasion the father was arrested for a domestic violence incident and placed on probation. That probation represented either a continuation of or an addition to a prior probation for larceny and motor vehicle charges. Between March and October, 1997, the father, whose address changed five times since late 1995, did not contact DCF about visits or services.
In August or September, 1997, the father was arrested for and charged with possession of marijuana, burglary, and violation of probation. After five months of pretrial detention, the father pleaded guilty to the charges and received a sentence with a release date of February 22, 1999. He will soon be eligible for parole or release to a half-way house. While in prison he received three disciplinary tickets for minor infractions of prison rules. He has not participated in prison programs such as addiction services largely because of his lengthy pretrial detention, his frequent transfer from one prison to another, and his disciplinary record. The father did not send his daughter a birthday or Christmas card or gift in late 1997. He did not request that DCF arrange visits or provide services at prison, and he did not in any other way maintain contact with DCF while in prison.
The father testified at trial to a dislike for DCF, in part stemming from his boyhood experience in a foster home, where he was abused, and in part stemming from what he felt was the indifference, inflexibility, and hostility he confronted in dealing with the first social worker assigned to the case. It does appear that he had a personality conflict with the first social worker, whose testimony at trial revealed a weakness in preparation and organizational skills. But the evidence as a whole demonstrates that the father can be an angry individual who blames authorities for his own mistakes. During visits with the social worker at the DCF office, the father would often become hostile and accusatory. At one point he put his hand, which was soiled from his work as a mechanic, in the social worker's face. To the mother, the father had said that he would "take down" CT Page 11513 everybody at DCF and had made a veiled threat to kill them. At trial, the defendant testified to the social worker's "reign of terror" and to her "blatant lie" and accused DCF of trying to "set[him] up." He blamed his criminal defense lawyer for his criminal sentence and was mildly critical of the Department of Corrections. He did not accept responsibility for his crimes or acknowledge the need for drug or anger counseling.
ADJUDICATION
A. Reunification
In order to terminate parental rights, the State must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. sec. 17a-112(c)(1). The Court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. As stated, on October 8, 1997, the Court made such a finding.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, the State must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. SeeIn re Michael B., 49 Conn. App. 510, 512 (1998). General Statutes sec. 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the Court waives the one year requirement based on the standards set forth in sec. 17a-112(d).[3] In this adjudicatory phase, the Court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book sec. 33-3 (a). The relevant date in this case is thus December 16, 1997.
The State in this case has alleged the grounds of abandonment, failure to rehabilitate, and lack of an on-going parent-child relationship with regard to both parents. The State alleges that these grounds have existed for more than one year. The Court finds that the State has proven its allegations. CT Page 11514
 1. Abandonment
General Statutes sec. 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App, 194, 208-209, cert. denied, 199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
The mother in this case missed seventeen of fifty-four scheduled visits between February, 1996 and November, 1997, particularly toward the end of that period. No valid excuse existed for these missed visits with her own daughter. The mother did not send her child birthday or Christmas gifts or even cards during this period. Most telling is the fact that, on two occasions in 1997, the mother requested that a visit with Elizabeth end early because the mother was bored.
The father's record of visits through mid-1996 is not perfect, but many absences stem from his commendable desire to provide financial support for his family. After October, 1996, the father's visits declined in frequency to the point where they ended in March, 1997. After that point, the father has not seen nor, as far as the evidence reveals, even communicated with his daughter. The father was not incarcerated during most of the remaining adjudicatory period and, in any event, incarceration does not constitute a complete defense to abandonment. See In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 443
(1982).Because the parents did, not "maintain" a reasonable degree of concern for Elizabeth throughout the statutory period, the Court concludes that the State has proven abandonment by both parents.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the CT Page 11515 parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). The statute requires the Court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C.,210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M.,49 Conn. App. 229, 240 (1998) (internal citation omitted).
No dispute exists that the Court has previously found Elizabeth to have been "uncared for," thus satisfying a statutory prerequisite. The rest of the statute requires the Court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes sec. 17a-112(c)(3)(C). Because of the requirement that the Court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the Court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
Marissa was clearly not ready to become a parent when, at age seventeen, she gave birth to Elizabeth. Although Elizabeth is a healthy child, the mother has not rehabilitated herself to the point where she can assume a responsible position in Elizabeth's life. Marissa has not graduated high school or, as far as the evidence reveals, maintained steady employment. of the counseling made available to her, Marissa completed one program unsuccessfully was discharged from two others due largely to her immaturity, and refused drug and alcohol treatment which, based on her history, she very much needed. Her decision to have another child out of wedlock demonstrates that she does not fully understand her problems. The State has proven that Marissa has failed to rehabilitate herself.
David J., the father, comes before the Court with a high school education, an employable job skill, and a desire to work hard. Offsetting those positive attributes, however, is, among CT Page 11516 other things, his criminal record, especially the fact that he has violated probation. The Court cannot readily conclude that someone who violates his criminal probation has rehabilitated himself, because the pendency of neglect and termination petitions is in a sense a probationary period for the right to have custody of a child and, if a parent has violated one probation, it becomes difficult to conclude that he has successfully completed the other. The father's failure, both before and while in prison, to obtain much needed counseling for his drug and anger problem also does not instill confidence in his ability to be a parent. Although part of the explanation for this failure lies in his pretrial status and transfers within the prison system, the other part of the explanation lies in his disciplinary record which, although minor, is his responsibility.
The father contends that this case is one of "slow drift," in which initial miscommunication and disagreement with DCF over a baby with medical needs caused DCF to "drift" away and ultimately recommend termination. There is some truth to this characterization, but it is also true that the initial miscommunication and disagreements were fueled by the father's angry, confrontational personality. After a new social worker took over the case in 1997, the responsibility for DCF's "drift" toward termination lies even more squarely with the father. It was the father, not DCF, who failed to complete or enroll in rehabilitative programs, missed visits with his own child, went to prison, and ceased communicating with his child.
There are and will be many cases in which parents blame DCF for bureaucratic indifference. The Court will look closely at these allegations. But, ultimately, adults who bring a child into this world owe that child a huge responsibility, regardless of how indifferent DCF may seem. See generally In re Juvenile Appeal(Docket No. 9489), 183 Conn. 11, 15 (1981). Particularly from 1997 on, the father in this case showed little of his own interest in rehabilitation or in becoming a responsible parent for Elizabeth. The Court concludes that State has proven the ground of failure to rehabilitate against the father.
3. No On-Going Relationship
The third statutory ground alleged in this case is that there is "no on-going parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational CT Page 11517 needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes sec. 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id. at 646.
The Court finds that the parents do not have an on-going relationship with Elizabeth. Her natural mother has not visited her since fall, 1997; her natural father since March, 1997. Elizabeth has not asked about her parents and has no present memories of them. She regards her foster parents as her mother and father and their residence as her home.
 4. One Year Requirement
The Court finds that the conditions supporting the termination of parental rights to Elizabeth existed for more than one year prior to filing of the petition. Moreover, the Court can waive the one year requirement if it finds that "[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." General Statutes sec. 17a-112(d)(1). Based on the discussion that follows of the best interests of the child, the Court waives the one year requirement to the extent necessary to sustain this decision.
DISPOSITION
In the dispositional phase of a termination case, the Court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes sec. 17a-112(c)(2). The Court can consider all events occurring through the close of the dispositional hearing. Practice Book sec. 33-5. In arriving at a decision, the Court must consider and make written findings regarding seven factors set out in General Statutes sec.17a-112(e). See In re Tabitha P., 39 Conn. App. 353, 362
CT Page 11518 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the Court finds that DCF provided foster care for Elizabeth and offered the parents visitation with transportation. In addition, DCF and other agencies offered the parties counseling for substance abuse problems, parenting skills, and domestic violence. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the Court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
At the time of commitment of Elizabeth, the Court approved the following expectations: (1) keep all appointments set by or with DCF, (2) Keep whereabouts known to DCF and your attorney, (3) visit the child consistently as often as DCF permits, (4) participate in parenting, family, and substance abuse counseling and, for the father, participate in a psychological evaluation, (6) follow the recommendations of all treatment providers, (6) sign releases as requested (upon review of counsel) concerning attendance, compliance, and recommendations, (7) secure and maintain adequate housing and income, (8) no substance abuse, and (9) no further involvement with the criminal justice system. As detailed above, DCF substantially met its obligation to provide assistance. Based on the foregoing discussion, the Court finds that, on the whole, the parents' compliance with these expectations was poor.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has CT Page 11519 exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Elizabeth is bonded to her present foster family. She is not bonded to her natural parents.
5) The age of the child.
Elizabeth is almost three years old. She has lived most of her life in foster care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal (83-CD),189 Conn. 276, 292 (1983). The Appellate Court has also observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In re Alexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interests of Elizabeth to keep her in temporary foster care settings for the purpose of giving the parents more time to rehabilitate themselves, especially when they have shown little progress in doing so.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the Court finds that the parents have not been successful in the limited efforts they have made to adjust their circumstances or conditions to facilitate reunification and they have not maintained regular contact with Elizabeth.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As stated above, the mother has been the victim of domestic CT Page 11520 violence caused by the father. But even after the latest episode in May, 1997, the mother did not complete domestic violence counseling at the Wheeler Clinic. Both parents have had difficulties in getting transportation to visits and counseling, stemming largely from economic realities. DCF did offer some assistance in this area. The reality is, however, that parents who devotedly care for their children must often overcome difficult economic circumstances, particularly if they seek to regain custody of a child who, due to their own behavior, is temporarily in State custody. Furthermore, in this case, other factors for which the parents are largely or solely responsible, including immaturity, lack of commitment, drugs, and other criminal behavior, have proven to be larger obstacles in the parents' attempt to regain custody.
CONCLUSION
Based upon the foregoing findings, the Court determines that it is in the best interest of Elizabeth J. for a termination of parental rights to enter with respect to the mother, Marissa B., and the father, David J. Accordingly, the Court hereby terminates their parental rights. The Court further orders that the Commissioner of DCF is appointed statutory parent for this child for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the Court's direction that they receive first consideration. The Commissioner shall file with this Court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Because the Court grants the termination petition, the Court finds the extension petition moot.
It is so ordered.
Carl J. Schuman Judge, Superior Court CT Page 11521
[2] Disturbingly, DCF records do not reflect the father's compliance with their request for a psychological exam and a DCF social worker testified inaccurately that the father had not complied.
[3] Effective July 1, 1998, section 8 of Public Act No. 98-241 eliminates the one year requirement, but the State does not claim reliance on this amendment, apparently because of concerns that a substantive change in the law should not apply retroactively to a petition, such as the petition here, filed before the effective date of the new law.